## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                              Crim. No. 12-183 (SRN)

          Plaintiff,

  v.                                                                **ORDER**

Michael Allen Smith,

          Defendant.

---

Michael Cheever, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

Shannon R. Elkins, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant Michael Allen Smith

---

SUSAN RICHARD NELSON, United States Magistrate Judge

      Pending before the Court is the Motion for a New Trial filed by Defendant Michael Allen Smith [Doc. No. 120].  An evidentiary hearing was held on this matter on December 19, 2017, during which Defendant offered the testimony of two jurors, A.J. and D.B.  (See Dec. 19, 2017 Redacted Hr'g Tr. at 16–25; 27–56 [Doc. No. 152].)  For the reasons set forth below, Defendant's motion is granted.

## I.    FINDINGS OF FACT

      In July 2012, defendant Michael Smith, an African American male, was charged by indictment with one count of being a felon in possession of a firearm and one count of illegally possessing a short-barreled shotgun.  (See Indictment [Doc. No. 1].)  Smith proceeded to a jury trial, which was held from December 12 to 14, 2012.  (See Trial

Minutes [Doc. Nos. 77–78, 83].)

### A.    Voir Dire

Prior to trial, the Court conducted the voir dire of the jury venire.  (See Dec. 12, 2012 Voir Dire Tr. [Doc. No. 107].)   The venire members were sworn to tell the truth, were encouraged to be forthright, and were invited to speak with the Court and the parties at sidebar about any sensitive topics.  (Id. at 3–6.)  Several jurors requested sidebars to respond to sensitive questions.  (Id. at 51, 57—58, 63, 66, 74.)  At Smith's request, the Court also permitted counsel for both sides to conduct fifteen minutes of voir dire after the Court's voir dire.  (See id. at 81–96, 128–35, 146–47.)  The Court struck nine venire members for cause.  (Id. at 98–117, 136–41.)

The Court instructed the prospective jurors that the purpose of voir dire was to ensure the selection of a fair and impartial jury.  (See id. at 4, 5, 117, 121.)  The venire members disclosed information concerning their experiences with, and attitudes toward, the police, North Minneapolis, and African Americans, (see id. at 47, 74–76, 77, 78–79, 84, 86, 87); their personal experiences with crime, (id. at 43, 44, 45, 47–48, 51, 58, 66, 88–89, 90, 118–121, 130–32); and their attitudes about firearm offenses (id. at 64, 74, 80, 123–24, 137).

Smith proposed voir dire questions regarding his race and the ability of jurors to be fair to him.  (See generally Def.'s Proposed Voir Dire [Doc. No. 46].)  The Court advised the jury that Smith is African American, and twice asked if his race would affect their ability to reach a fair and impartial verdict.  (Dec. 12, 2012 Voir Dire Tr. at 74–76.)  The

Court further asked whether any juror believed that African Americans were more likely than others to possess guns.  (Id. at 76).  Additionally, the Court asked whether the prospective jurors' experiences with African Americans—through work, school, residence, or otherwise—might impact their ability to be fair in this case.  (Id. at 76–77.) Neither the Government nor defense counsel supplemented the Court's venire with additional inquiries regarding race.

During attorney voir dire, defense counsel asked venire members whether they lived or worked in North Minneapolis.  (Id. at 82–84, 128–29.)  Several, including two who served on the jury, had such experience:  Juror D.B. delivered flowers in North Minneapolis, (id. at 82–83), and Juror B.C. attended church there and drove a bus for children in the neighborhood to attend the church.  (Id. at 84.)

Upon being empaneled, each member of the jury venire swore another oath to be fair and impartial and to follow the Court's instructions.  (Id. at 149.)

**B.     Trial**

At trial, the evidence established that Smith lived in North Minneapolis and was a convicted felon.  (See Trial Tr. at 307, 338.[1])  He was previously convicted of third-degree murder in Minnesota in 2001, and in 2005 and 2006 was convicted of fourth degree assault in Minnesota based on attacks made on prison guards while serving his murder sentence.  (See Indictment Count 1.)  The Court redacted the Indictment presented to the jury so it would only allege that Smith had previously been convicted of a single,

---

[1]  All references to the three-volume Trial Transcript are found at Doc. Nos. 110–112.

unidentified felony.  (See Jury Instructions at 11 [Doc. No. 84]; Trial Tr. at 394.)  Smith

entered a stipulation pursuant to Old Chief v. United States, 519 U.S. 172 (1997),

admitting to a felony conviction prior to the date of the crime charged in Count 1.

(See Jury Instructions at 13; Trial Tr. at 397.)

The Government's primary fact witnesses were two Minneapolis police officers,

Sean Lessard and George Warzinik.  At approximately 9:15 p.m. on April 28, 2012, they

and several other officers responded to the area around North 26th Avenue and Penn

Avenue North in Minneapolis, looking for suspects in an armed robbery that had just

occurred near a gas station.  (Trial Tr. at 23.)  The suspects were initially described as

three black men, one of whom possessed a silver gun and at least one of whom was

wearing a black "hoodie."  (Id. at 62, 301.)

Initially, Officers Lessard and Warzinik saw Smith from behind as he was walking

northbound on the west side of Oliver Avenue, just north of 27th Avenue.  (Id. at 29–30,

115–16.)  Warzinik testified that Smith was not wearing a black hoodie, nor was he in the

company of two other people.  (Id. at 62–63.)  The officers testified that Lessard briefly

shined a very bright spotlight on Smith.  (Id. at 30–31, 154.)  After seeing Smith look

back at them in response to the spotlight, they testified that Smith immediately changed

direction, walking northwest through an empty lot, toward an alley.  (Id. at 30, 115–16.)

Both officers testified that they then saw Smith remove a long object from his pants,

discard the object in the lot, then sprint away, north up the alley.  (Id. at 31, 116.)

Officers Lessard and Warzinik stopped their squad car near the empty lot.  (Id. at

27, 116–17, 157–58.)  Lessard pursued Smith on foot, calling out Smith's location on his

4

radio as he ran.  (Id. at 116, 157.)  Warzinik testified that while the chase was underway, he retrieved the object that he saw Smith discard—a semi-automatic, 20-gauge, short-barreled shotgun.  (Id. at 32–33.)  Warzinik also recovered a plastic baggie with five 20-gauge shotgun shells from the same location.  (Id. at 32–35.)  Warzinik then drove the squad car to the area where Smith was apprehended.  (Id. at 66.)

No physical or forensic evidence linked Smith to the recovered gun.  (See id. at 179–81.)  Rather, the Government's forensic expert testified that the forensic samples taken from the gun contained a mixture of DNA from two or more people, but excluded Smith.  (Id.)

Smith testified that on the night of April 28, 2012, he was walking north on Oliver Avenue.  (Id. at 328.)  One of Smith's neighbors, Margaret Little, testified that on that night, around 9:15, she was also outside with her pet dog.  (Id. at 150–51.)  From her vantage point near an empty lot at 2719 Oliver Avenue, she observed Smith walking on the sidewalk.  (Id. at 151–53.)  She testified that he was casually walking with a normal gait, and not with the gait of a person concealing a gun in his pants.  (Id. at 151–53, 172.)  As he approached her within arm's length, Ms. Little observed no visible weapon on Smith's person.  (Id. at 153.)  Both Smith and Little testified that they exchanged brief pleasantries, commenting on either a stray black cat or Ms. Little's dog.  (Id. at 154, 328.)

Smith testified that after he left Ms. Little, he continued on his walk, with his eyes on his cell phone, as he was about to send a text to his girlfriend.  (Id. at 328.)  As he drew closer to his neighbor's house, he testified that he heard an engine "revving up

behind me." (Id.) Smith said he "got terrified" because, "[t]he first thing that went through my mind was drive-by [shooting]. (Id. at 329, 331, 334.) He stated that North Minneapolis is a "violent neighborhood," and he did not want to become a crime victim. (Id. at 334.) Ms. Little also testified to high levels of crime in the neighborhood. (Id. at 144–146.)

After hearing the car, Smith said that he looked over his shoulder and did not see anything, but immediately started running. (Id. at 331.) Smith testified that he first ran away from Oliver Avenue, then north up the alley. (Id. at 331–34, 349.) Rather than running through the empty lot, Smith testified that he ran between the two houses just north of the empty lot, specifically 2723 Oliver Avenue and his own house, 2727 Oliver Avenue. (Id. at 331–35.)

Smith stated that he sprinted past about three houses in the alley, including the back door of his home. (Id. at 334, 349.) He felt that he might not be able to get into his house because he lacked keys to the front door, and the back door could be locked, putting him at risk of "get[ting] shot down." (Id. at 334.) Smith then turned east, cutting through a yard and across Oliver Avenue. (Id. at 334–35.) Smith stated it was then that he realized that the car whose engine he had heard was a squad car and that a police officer was chasing him. (Id. at 335.) Smith also admitted that he could hear Officer Lessard yelling "Police!" and ordering him to stop, but Smith continued to flee. (Id.) He zig-zagged east through a yard on the east side of Oliver, north through the alley between Oliver and Newton Avenue North, then east again, through a yard near 2815 Newton, and north again, in front of the house. (Id. at 117–18, 335–36, 342–43.)

As he emerged in front of 2815 Newton, officers saw Smith and arrested him.  (<u>Id.</u> at 219-23.)  A K-9 squad arrived on the scene to look for any discarded stolen property in the area, but found nothing.  (<u>Id.</u> at 225.)

At trial, Smith admitted that he saw a gun in his house on April 28, in the afternoon and later in the evening, around 9:15 p.m.  (<u>Id.</u> at 314–15.)  He testified that it looked like the gun admitted in evidence as Government Trial Exhibit 1.  (<u>Id.</u> at 315.)  Smith testified that around 3:00 p.m. on April 28, he spoke with three others at the house about a robbery that one of them, NaGary, was planning of the house directly across the street.  (<u>Id.</u> at 313.)  NaGary was the brother of Smith's roommate Nikia, and did not live at the house.  (<u>Id.</u> at 312–13.)  According to Smith, his neighbors ran drug sales and prostitution out of their house.  (<u>Id.</u>)  Smith advised NaGary that his robbery plan was stupid and dangerous, because Smith, who lived in the house, would have to contend with any resulting fallout with the neighbors.  (<u>Id.</u>)  Smith said that he saw NaGary place the gun behind the sofa at that time.  (<u>Id.</u> at 313–15.)

Smith further testified that later that evening, around 9:00 p.m., his roommate Nikia summoned him downstairs, explaining that he had just seen three men run by the house, "acting like they had guns."  (<u>Id.</u> at 319.)    At Smith's suggestion, he and Nikia went outside to investigate.  (<u>Id.</u> at 320–21.)  Finding no one there, Smith testified that he decided to go for a walk.  (<u>Id.</u> at 321.)  Both he and his neighbor Ms. Little testified that while Smith was walking past Little's house, they exchanged brief pleasantries.  (<u>Id.</u> at 153–54.)  Little did not observe any weapon on Smith's person, and testified that he was walking in his usual manner.  (<u>Id.</u>; 172.)  Little testified that shortly after Smith passed, a

7

young man with a red hat appeared out of nowhere.  (Id. at 161, 170.)  She was uncertain

whether he appeared before the police arrived or after.  (Id.)

Smith testified that as he walked near his house, he saw NaGary come out of the

back door.  (Id. at 323.)  Smith said that NaGary was walking stiffly on one side, and

Smith assumed that NaGary had hidden the short-barreled shotgun in his pants leg.  (Id. at

323–24.)

Once Smith testified, the Court admitted evidence of his three prior felony

convictions pursuant to Federal Rule of Evidence 609.  The jury was allowed to consider

the convictions in assessing Smith's credibility.  (Jury Instructions at 9; Trial Tr. at 393.)

The government sought to introduce evidence of the types of crimes for which Smith had

been convicted.  (See Gov't's Trial Mem. at 4–6 [Doc. No. 55].)  At Smith's request,

however, the Court limited the Rule 609 evidence to the fact that he was convicted of

three felonies and the year of each conviction.  (See Def.'s Mot. in Limine to Limit 609

Ev. [Doc. No. 61]); Dec. 7, 2012 Order at 1–5 [Doc. No. 71].)  No evidence of the nature

of his prior convictions or the length of his sentences was introduced at trial.

The jury began its deliberations at 1:17 p.m. on Friday, December 14, before its

lunch break.  It returned its verdict at 6:15 p.m.  (Trial Tr. at 409–10.)  The jury found

Smith guilty on both counts.  (Id. at 411.)  The Court polled the jury, and each juror

confirmed their agreement on the verdict.  (Id.)

## C.    Motion for a New Trial

On March 15, 2017, the Court received an email from D.B., who had served as the

foreperson of the jury.  D.B. had recently become aware of the U.S. Supreme Court's

decision in <u>Peña-Rodriguez v. Colorado</u>, 137 S. Ct. 855 (2017), describing it as a case "dealing with racial remarks made during jury deliberation." (<u>See</u> Court's Mar. 17, 2017 Letter at 2 [Doc. No. 129-1], Def.'s Ex. 1 to Reply.) D.B. expressed interest in talking to someone about this ruling, "as it could pertain to [Smith's] case," because "[a] racial remark was made during our deliberations." (<u>Id.</u>) The Court forwarded the email to counsel for Smith and the Government two days later, on March 17, 2017. (<u>Id.</u> at 1.)

In October 2017, Smith filed a motion for a new trial, alleging that a juror made improper racial statements during jury deliberations. (<u>See</u> Def.'s Mot. for New Trial [Doc. No. 120].) In support of his motion and his request for a hearing, Smith provided the affidavits of two jurors. In the affidavit of Foreperson D.B., D.B. recalled a statement made by another juror, W.B., during deliberations. (D. B. Aff. ¶¶ 1–5, 13 [Doc. No. 120-2].) D.B. recalled that W.B. was a male juror from St. Bonifacius, Minnesota. (<u>Id.</u> ¶ 8.) D.B. asserted that W.B. made a statement during the jury's deliberations to the effect of, "You know he's just a banger from the hood, so he's got to be guilty." (<u>Id.</u> ¶ 13 .) D.B. contended that no jurors responded, although he regretted not doing so. (<u>Id.</u> ¶¶ 16, 25.) He further attested that W.B.'s comment caused him to reconsider Smith's credibility in light of his race and where he lived, rather than through the evidence. (<u>Id.</u> ¶ 21.)

In the affidavit of another juror, A.J., he recalled that during deliberations, a middle-aged white male juror "made comments similar to, 'look[,] he is a black person with a previous criminal record living in North Minneapolis.'" (A.J. Aff. ¶ 5 [Doc. No. 120-1].) A.J. contended that the remark was made to the entire jury. (<u>Id.</u>)

As previously noted, the Court scheduled a hearing for December 19, 2017. The
Court first considered legal argument, then determined that the juror's statements
described in the affidavits warranted further development of the record. (Dec. 19, 2017
Redacted Hr'gTr. at 14.) The Court therefore permitted the evidentiary hearing to
proceed. Smith offered the testimony of Jurors A.J. and D.B., who were subpoenaed to
appear. The Government presented no witnesses.

At the hearing, A.J. testified that during deliberations, and prior to the final vote,
one juror made a statement to the entire group to the effect of "'[Smith]'s a black man
from North Minneapolis with a previous criminal history.'" (Id. at 18–19.) Juror A.J.
construed that to mean "once a criminal, always a criminal." (Id.) He did not perceive
the comment as racist. (Id. at 24.) Juror A.J. further testified to his belief that he was the
last juror holding out for a not-guilty verdict. (Id. at 19.) During cross examination, A.J.
acknowledged that the Court had instructed the jury that it could consider Smith's prior
felony convictions in assessing his credibility. (Id. at 22.) He stated that his eventual
decision to find Smith guilty was based on the evidence. (Id. at 23.) Juror A.J. could
not recall any jurors making comments about gangs, or referring to Smith as a "banger"
during the deliberations. (Id. at 25.)

Foreperson D.B. testified that during deliberations, because no physical evidence
linked Smith to the gun, the jury focused on the credibility of the witnesses, reaching
different conclusions. (See id. at 28–29.) D.B. testified that one juror, who the Court
finds to be the same juror identified by A.J., stated that the testifying police officers had
no motivation to lie. (Id. at 30.) D.B. recalled that that juror then stated to the jury

10

members, "'Besides, [Smith's] just a banger from the hood and he [is] guilty.'" (Id. at 30.)

D.B. understood the term "banger" to mean that Smith was a black gang member from North Minneapolis. (Id. at 31.) He could not recall any evidence elicited at trial that Smith was a gang member. (Id.) D.B. stated that after hearing that statement, and despite being shocked and upset by it, he began to "review[ ] the evidence more along the lines of, yes, [Smith] was a black man from North Minneapolis and could have possibly committed the crime he was being charged with. And I was looking more towards that than the evidence presented during the trial." (Id. at 32–35, 40.) D.B. stated that he later felt badly about his actions, and believes that he violated his oath as a juror "because my verdict did not come in based on the evidence." (Id.) Instead, he testified that he changed his vote to convict based on Smith's race, and despite knowing that the juror's "banger" statement was inaccurate. (Id. at 40–41, 51–52.)

Although in his affidavit D.B. stated that jury deliberations occurred over two days, (see D.B. Aff. ¶¶ 2–7), he acknowledged at the evidentiary hearing that the deliberations occurred over a five-hour period on a single day. (Dec. 19, 2017 Redacted Hr'g Tr. at 33, 39.) While D.B. conceded that his memory may have been faulty about the timing of deliberations, the juror's statement stood out in his mind. (Id. at 34.) He stated that he was personally upset by the remark and "maybe more upset" that he failed to challenge the juror at the time. (Id.)

D.B. testified that after returning home from the final day of trial, he confided in his wife that he had convicted the defendant based on his race. (Id. at 53.) He conceded,

however, that he did not raise his concerns with the Court when the Court presented the jurors with certificates immediately following the trial. (Id. at 43–44.) Nor did he raise the issue when he appeared with other recent federal court jurors who spoke about their respective experiences at a May 2013 Federal Bar Association seminar. (Id.) Nor did D.B. raise his concerns when he spoke with Smith's defense counsel at the conclusion of the 2013 seminar. (Id.) Rather, he testified that until he came forward in March 2017 in the wake of the Peña-Rodriguez decision, he had only discussed the impact of Smith's race on his decision to convict with his wife. (Id. at 53.) D.B. explained that he did not discuss it during the intervening four years because he "wasn't proud of it." (Id.) He further stated that he regretted his vote during that four-year period. (Id. at 55.)

D.B. further testified that when he read the news about the Peña-Rodriguez decision, he hoped that his information might lead to a new trial for Smith. (Id.) At that time, however, D.B. could no longer recall the name of the presiding judge, the names of other jurors, or the precise crime at issue in Smith's case. (Id. at 47–48.) It took D.B. some additional time to determine the name of the presiding judge, who he then contacted via email. (Id. at 34–35.) When he did not receive a response to his email to the Court, he contacted the Federal Defender's Office. (Id.)

Following the jurors' testimony, the Court directed the parties to submit proposed findings of fact and legal argument in support of their respective positions. (Id. at 56–57.) The Court stated that it would evaluate the testifying jurors' credibility. (Id. at 56.) Then, assuming that Smith met the burden of showing that the jurors were exposed to statements that infected the deliberative process with racially-charged language or

12

stereotypes, the Court would evaluate whether Smith was prejudiced by the jury's exposure to the statements. (Id.)

## II.    DISCUSSION

### A.    Delay in Filing Motion

Although the Government previously argued that Smith's motion for a new trial was untimely under Fed. R. Crim. P. 33(b), (see Gov't's Response at 1–3 [Doc. No. 126]), it now agrees that Smith should be excused for not filing the motion prior to March 17, 2017—the date on which the Court notified counsel about D.B.'s email. (Gov't's Post-Hr'g Mem. at 38 [Doc. No. 156].) However, the Government asserts that the Court has no authority to rule on the merits of Smith's motion for a new trial without first considering whether Smith's subsequent delay between March 17, 2017 and the filing of his motion on October 27, 2017 is excusable. (Id. at 38–39.)

Under Fed. R. Crim. P. 33, "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). To obtain a new trial on the basis of newly discovered evidence, the Eighth Circuit requires the movant to show that "'(1) the evidence is in fact newly discovered since trial; (2) diligence on his part; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) it is probable that the new evidence would produce an acquittal at the new trial.'" United States v. Shumaker, 866 F.3d 956, 961 (8th Cir. 2017) (citing United States v. Bell, 761 F.3d 900, 911 (8th Cir. 2014)). This is a "rigorous" standard, because such motions are disfavored. Id. (citing United States v. Baker, 479 F.3d 574, 577 (8th

Cir. 2007)).

The newly discovered evidence here was transmitted to Smith's counsel and counsel for the Government on March 17, 2017, and attached D.B.'s March 15, 2017 email to the Court. (See Court's Mar. 17, 2017 Letter at 1–2.) In D.B.'s email, although he did not identify Peña-Rodriguez by name, he indicated that a recent Supreme Court decision prompted his email and he alleged that "[a] racial remark was made during our deliberations." (Id. at 2.) This evidence was newly discovered since Smith's December 2012 trial.

The Court also finds that Smith's counsel was diligent in investigating and filing Smith's motion between her receipt of the Court's March 17, 2017 letter, and the October 27, 2017 filing date. Email correspondence in November 2017 between defense counsel and former counsel for the Government indicates that during preceding months, defense counsel and an investigator communicated with D.B. via email, interviewed D.B. in May 2017, prepared a report concerning the interview of A.J., and, between May and September 2017, unsuccessfully attempted to interview a third juror, M.S., with whom the investigator had approximately three conversations, and obtained the affidavits of D.B. and A.J. (See Nov. 2017 email chain at 1, Ex. 2 to Def.'s Reply [Doc. No. 129–2].) Defense counsel then prepared and filed the underlying motion and memorandum. The Court also observes that throughout this period, defense counsel handled a full caseload of clients as a U.S. Federal Defender. Given these multiple tasks, the Court finds that the seven-month period between Smith's first knowledge of the alleged racial remark and the filing of the instant motion was not unreasonable. The Court is therefore satisfied that

Smith was diligent in bringing his motion.

Regarding whether the newly discovered evidence is merely cumulative of evidence presented at trial, the Court finds that it is not. Rather, this evidence concerns facts bearing on the jury's assessment of credibility and guilt. Nor does the Court consider it "impeaching," as it does not contradict evidence presented at trial. See Shumaker, 866 F.3d at 961 (finding that defendant's utility bills, collected post trial, were not material to his charges of drug possession with intent to distribute; although the new evidence potentially called into question the date on which the defendant moved into the residence, they did not contradict testimony about the material question of where he kept his methamphetamine). As to materiality, the Court finds that the jury deliberation evidence is material. Because no physical evidence concerning Smith's possession of the gun pointed to him, any racist remarks concerning witness credibility and guilt were material to the issues in the case.

Finally, the question of whether it is probable that the new evidence would produce an acquittal in a new trial is not well-suited to these facts. The newly discovered evidence concerned jury deliberation, including subjective assessments of credibility. While it is possible that absent such remarks, Smith might be acquitted in a new trial, the Court cannot say that such a result is "probable."

However, under Fed. R. Crim. P. 45(b)(1)(B), a district court "may extend the deadline for the filing of a new trial motion after the time expires if the movant failed to act because of excusable neglect." United States v. Boesen, 599 F.3d 874, 879 (8th Cir. 2010). The Eighth Circuit has identified the following factors that courts must consider

when determining whether to permit a filing extension based on excusable neglect: (1) "the danger of prejudice to the [opposing party]"; (2) "the length of the delay and its potential impact on judicial proceedings"; (3) "the reason for the delay, including whether it was within the reasonable control of the movant"; and, (4) "whether the movant acted in good faith." Id. (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993)).  The key factor in the analysis is the reason for delay.  Kurka v. Iowa Cnty., Ia ., 628 F.3d 953, 959 (8th Cir. 2010) (citation omitted).

The Court finds that Smith satisfies these factors.  As noted above in the discussion of diligence, the reason for the seven-month delay was due to the investigative work of defense counsel.  This delay was certainly not within the control of Smith himself and weighs in his favor.

As to prejudice to the Government and the impact on judicial proceedings, the Government does not challenge the significantly longer period between Smith's 2012 conviction and his discovery of the new evidence in March 2017.  Certainly, memories fade over the course of time, but given the lack of objection to an extension for the longer, four-year period, the danger of prejudice to the Government from the additional seven month-period is minimal.  The Government has not identified whether the trial witnesses have become unavailable during this period.  Moreover, the Government was equally free to interview D.B. and other jurors between March and October 2017, but appears to have done so only after Smith filed his motion.  The seven-month delay also has minimal impact on judicial proceedings, as the Court assigns high priority to criminal matters, whenever they arise.

16

Finally, the Court finds that Smith acted in good faith during the seven-month period. It appears that his counsel carefully proceeded to investigate D.B.'s claims. Accordingly, for all of the foregoing reasons, the Court finds that Smith meets the excusable neglect standard and the Court has authority to entertain his motion.

### B.    No-Impeachment Rule

A new criminal trial may be warranted "where a defendant has or may have been deprived of his Sixth Amendment right to trial by an impartial jury." United States v. Brown, 913 F. Supp. 1324, 1333 (D. Minn. Jan. 11, 1996), aff'd, 108 F.3d 863 (8th Cir. 1997) (citing United States v. St. Clair, 855 F.2d 518, 523 (8th Cir. 1988)). In order to gain a new trial on the grounds of juror misconduct, a moving party must present evidence that is not barred by Federal Rule of Evidence 606(b) and that establishes grounds that are adequate to overturn the verdict. United States v. Tucker, 137 F.3d 1016, 1031 (8th Cir. 1998) (citing United States v. Caldwell, 83 F.3d 954, 956 (8 Cir. 1996)). Rule 606(b) prohibits jurors from testifying about (1) any statements made during deliberations; (2) the effect of anything on that juror's or another juror's vote; or (3) any juror's thought processes concerning the verdict. This rule codifies a long-standing common law prohibition against impeaching a jury's verdict. See Peña-Rodriguez, 137 S. Ct. at 863–64. The rule encourages fulsome deliberations by giving jurors assurance that they will not later be asked to discuss the deliberative process. Id. at 865. It also provides jurors with some assurance against harassment by litigants after the jury renders a decision, and promotes the stability and finality of verdicts. Id.

There are limited exceptions to the "no-impeachment rule," however, which do

permit a juror to testify in certain circumstances. Jurors are permitted to testify about: (1) whether extraneous prejudicial information was improperly brought to the jury's attention; (2) whether any outside influence was employed upon any juror; or (3) whether there was a mistake in entering the verdict onto the verdict form. Fed. R. Evid. 606(b)(2)(A). In Peña-Rodriguez, the Supreme Court also held that

> where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

137 S. Ct. at 869.

For this racial-comment exception to apply, there must be evidence "showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." Id. Mere "offhand comment[s]" indicating racial bias or hostility are insufficient to overcome the no-impeachment rule and to permit further judicial inquiry into the fairness of the verdict. Id. Additionally, the statement "must tend to show that racial animus was a significant motivating factor in the juror's vote to convict." Id.

The moving party thus bears the burden of establishing both elements in order to overcome the no-impeachment rule. See id. It is within the trial court's discretion to determine whether that threshold is met. Id. The trial court is to make the determination "in light of all the circumstances," including the content and timing of the alleged statements, and the reliability of the proffered evidence. Id.

In Peña-Rodriguez, the defendant, a Hispanic male, was found guilty of unlawful

sexual contact and harassment, but the jury failed to reach a verdict on an attempted sexual assault charge. Id. at 861. As here, the statements in question were made during the jury's deliberations. Id. After reaching their verdict, two jurors approached counsel as the courtroom was emptying. Id. They informed counsel that another juror had expressed anti-Hispanic bias against the defendant and his alibi witness during deliberations. Id. The juror was alleged to have stated that "Mexican men are physically controlling of women because of their sense of entitlement," "I think he did it because he's Mexican and Mexican men take whatever they want," and "nine times out of ten, Mexican men were aggressive toward women and young girls." Id. The Supreme Court found the statements unmistakably egregious and reliant on racial bias, noting that the juror not only invoked racial stereotypes in reaching his own conclusion of guilt, but also invited other jurors to join in a vote to convict on that basis. Id. at 870.

While Peña-Rodriguez set forth the applicable standard to overcome the no-impeachment rule for race-based juror comments, the Supreme Court expressly declined to address the procedures that a trial court must follow when presented with a motion for a new trial based on juror testimony of racial bias. Id. at 870. In cases involving claims of improper racial bias by members of the jury, one procedure that courts have utilized is to hold an evidentiary hearing regarding the purported racially biased statements. See, e.g., Williams v. Price, No. 2:98cv1320, 2017 WL 6729978, at *2 (W.D. Penn. Dec. 20, 2017) (noting that an evidentiary hearing was held); Commonwealth v. McCowen, 939 N.E.2d 735, 764 (Mass. 2010) (stating that the trial court should conduct an evidentiary hearing when a defendant files an affidavit from a juror alleging that another juror's

comments reasonably demonstrated racial bias, and the credibility of the affidavit is in issue).  Courts have also considered evidence exclusively from jurors' affidavits.  See, e.g., Patton v. First Light Property Mgmt., Inc., No. 14-cv-1489 (AJB-WVG), 2017 WL 5495104, at *4 (S.D. Cal. Nov. 15, 2017) (discussing juror's affidavit, but apparently not conducting an evidentiary hearing), appeal docketed, No. 17-56861 (9 Cir. Dec. 13, 2017).

And cases in which parties have alleged one of the other no-impeachment rule exceptions also provide useful guidance.  For instance, in a case in which a criminal defendant alleged improper outside contact with a jury, the Eighth Circuit has held that where a party makes a showing of outside contact, presenting a reasonable possibility of a prejudiced verdict, the party "is entitled to a hearing on the matter." Tucker, 137 F.3d at 1030–31 (citations omitted).  The Eighth Circuit examined Tucker's assertions of juror misconduct, finding them serious, and remanded the matter to the trial court with instructions to conduct an evidentiary hearing.  Id. at 1033.

Here, the Court reiterates its earlier verbal finding from the December 17, 2017 proceeding that an evidentiary hearing was an appropriate means by which to adduce additional facts necessary to the determination of whether the no-impeachment rule must give way under Peña-Rodriguez.[2]  As noted, Smith presented the Court with sworn affidavits of Jurors A.J. and D.B., containing alleged race-related statements made by a fellow juror.   These affidavits presented serious allegations of racial bias and a

---

[2] To the extent there are any differences between the verbal rulings at the evidentiary hearing and these findings and conclusions, this Order controls.

reasonable possibility of a prejudiced verdict, entitling Smith to a hearing. The Court's consideration of those affidavits is also proper.

### C.     Application of <u>Peña-Rodriguez</u>

In his affidavit and at the evidentiary hearing, D.B. described juror W.B.'s statement that Smith was a "banger from the hood and was guilty." Following the <u>Peña-Rodriguez</u> framework, the Court first considers whether this statement clearly indicates racial bias or hostility. <u>See</u> 137 S. Ct. at 869. The Government argues that the statement contains no reference to Smith's race.

In <u>Peña-Rodriguez</u>, the Supreme Court noted that the experience of other courts in the past and future "will inform the proper exercise of trial judge discretion in these and related matters." <u>Id.</u> at 870. The decision in <u>State v. Johnson</u>, 630 N.W.2d 79, 83–85 (S.D. 2001), provides useful guidance. The case involved an African American man who was tried for the third-degree rape of a 15-year-old white girl. <u>Id.</u> at 80. During jury selection, while counsel were preoccupied with the determination of their peremptory challenges, a potential juror stated,"I've got a rope." <u>Id.</u> The venire member's comment prompted another potential juror to state, "I've got a tree." <u>Id.</u> After the jury had been impaneled—and the juror who had made the rope comment was selected for the jury—counsel learned of the statement and informed the court. <u>Id.</u> The court then questioned the juror about his remark. <u>Id.</u> at 81. The juror stated that he had been joking, was not trying to influence anyone, and that he could keep an open mind as a juror. <u>Id.</u> Because the trial court found that the juror did not have a state of mind evincing bias or prejudice that would result in unfairness, trial proceeded. <u>Id.</u> at 81–82. The court then

denied the defendant's motion for a mistrial, but gave a jury instruction directing the jury to disregard racial prejudice in reaching their verdict. Id. at 82.

On Johnson's appeal following his conviction, the South Dakota Supreme Court held that the district court abused its discretion in denying Johnson's motion for a new trial. Id. at 84. The court first found that the remarks—which did not explicitly mention Johnson's race—were racially derogatory, stating, "the prejudicial remarks were of a severe nature that indirectly classified Johnson by his race and invoked the prejudice associated with the historical treatment of African–American males who have allegedly committed sexual improprieties with young Caucasian girls." Id. at 85.

Similarly here, when considered without context, the term "banger"—slang for "gangbanger"—does not explicitly invoke race. See Merriam Webster Dictionary, https://www.merriam-webster.com/ dictionary/banger (last visited April 23, 2018). As noted, no evidence at trial identified Smith as a gang member. However, the juror combined "banger" with the phrase "from the hood," with "hood" referring to an inner-city neighborhood. See id., www.merriam- webster.com/ dictionary/hood (last visited April 23, 2018). Trial testimony made clear that the "hood" in question was North Minneapolis. (See, e.g., Trial Tr. at 60–62, 78, 143, 146, 307, 334.) The racial demography of North Minneapolis is majority African American. See Twin Cities Daily Planet, https://www.tcdailyplanet.net/ ethnic-makeup-changed-north-minneapolis/ (describing data compiled by the U.S. Census Bureau and City of Minneapolis over a 30-year period (1980–2010) (last visited April 23, 2018)). The juror used a racially biased stereotype to find that Smith—a black man from a majority-black neighborhood of

Minneapolis—was a gang member, should be disbelieved, and was guilty. The statement's reasoning employed the racist stereotype that black men from the inner city are gang members. The racially-charged language ("banger from the hood") was coupled with views on Smith's guilt, creating a relationship between the two. Given this context, the Court finds the statement clearly indicates racial bias.

The Court also finds that the "banger" statement "tend[s] to show that racial animus was a significant motivating factor in the juror's vote to convict," Peña-Rodriguez, 137 S. Ct. at 869, because, as noted above, it directly ties a race-based stereotype to W.B.'s conclusion of guilt through the use of the conjunctive "and." It is not unlike the statement of the juror in Peña-Rodriguez who believed the defendant was guilty of a sex crime because of racist stereotypes about Mexican men.

The Government argues that the language from Peña-Rodriguez, 137 S. Ct. at 869,—specifically, "the juror's vote,"—refers exclusively to the juror who made the racially-charged comment, prohibiting the Court from considering the effect of the statement on other jurors. (See Gov't's Post-Hr'g Mem. at 45, n.7; 46–47.) The Court agrees that the language concerning whether racial animus was a significant motivating factor in "the juror's vote" refers to the vote of the commenting juror. However, the Court does not read Peña-Rodriguez so narrowly as to prohibit the Court from considering the alleged statement's effect on other jurors. To the contrary, Peña-Rodriguez urges the district court, in its discretion, to consider "all the circumstances" in determining whether the threshold test has been met. 139 S. Ct. at 869. Furthermore, among the prohibited subjects of inquiry under Rule 606(b)(1), absent an exception, is the

effect of juror statements during deliberations on "that juror's <u>or another</u> <u>juror's</u> vote; or

<u>any juror's</u> mental processes concerning the verdict or indictment."  Fed. R. Evid.

606(b)(1) (emphasis added).  Provided an exception applies, this suggests that

consideration of the statement's impact on the non-commenting jurors is appropriate.

Moreover, as the Supreme Court itself observed in <u>Peña-Rodriguez</u>, not only did

the commenting juror use a dangerous racial stereotype to find the defendant guilty, he

encouraged other jurors to do the same.  137 S. Ct. at 870.   Nothing in that opinion

suggests that the commenting juror explicitly solicited the other jurors to join in his

reasoning, rather, it appears that the "encouragement" arose by virtue of making the

statement during deliberations.  The same is true here—in making the racial comment,

other jurors were encouraged to join in the vote to convict.  Not only were jurors

encouraged in the abstract to join W.B. in convicting based on racial stereotypes, but D.B.

testified that he actually did so.  He stated that W.B.'s comment caused him to reconsider

his original position of not guilty, and to rely on racial stereotypes to convict Smith,

approximately 30 minutes after hearing the statement.  (Dec. 19, 2017 Redacted Hr'g Tr.

at 31.)

Recent decisions from other courts have addressed the effect of racially biased

statements on the commenting juror and other jurors.  In <u>United States v. Robinson</u>, 872

F.3d 760, 770–71 (6th Cir. 2017), <u>petition for cert. filed</u>, No. 17-7970 (U.S. Mar. 6,

2018), the jury foreperson, a white woman, commented to two black jurors, A.R. and

M.S., that they, "the colored women[,]" were the only jurors who "couldn't see" that the

black defendants were guilty.  <u>Id.</u> at 768–69.  The foreperson then accused A.R. and M.S.

of protecting the defendants out of duty to their "black brothers." Id. The court found

that while the statements were overtly racist, there was no showing that racial animus

triggered the foreperson's vote to convict. Id. at 771. Rather, the statements impugned

her fellow jurors, but not the defendants. Id. As to the effect on other jurors, A.R. and

M.S. reported that the statements did not affect their votes to convict, leading the Sixth

Circuit to conclude that "the foreperson's animus appeared not to have influenced A.R.'s

or M.S.'s vote." Id. The court therefore found that Peña-Rodriguez "d[id] not overcome

the no-impeachment rule here." Id.

The court in Patton, 2017 WL 5495104, at *4, also addressed whether a racial

remark had an effect on other jurors. In a housing discrimination civil suit brought by a

Native American, the court found that a juror's comments about Native Americans'

casino payments and receipt of government assistance were not overtly racist. Id. And,

as part of its analysis, the court found no evidence "that any of the jurors depended on a

racial stereotype in coming to their verdict." Id. at 7.

Other recent decisions have not addressed the effect of purportedly biased

comments on non-commenting jurors simply because the facts did not require it.

Analogizing to the facts of Robinson, the court in Williams, 2017 WL 6729978, at *9–10,

found that jurors' alleged racial slurs about a black juror were not directed to the black

defendant, but to the juror, and the comments gave no indication of how the speaking

juror would vote. Given that the comments were not even aimed at the defendant, in

determining that the Peña-Rodriguez threshold was not met, the court did not address the

effect of the comments on other jurors. See id. Similarly, in John v. McEwen, No. CV

25

12-5174-DMG (PLA), 2017 WL 4176118, at * 7 (C.D. Cal. Mar. 22, 2017), aff'd, 2017

WL 4119153, at *1 (D.C. Cal. Sept. 18, 2017), appeal docketed, No. 17-56424 (9th Cir.

Sept. 19, 2017), the court did not address the effect of comments on other jurors as it

found that "none of the purported instances of juror misconduct involves the introduction

of racial animus or extraneous matters into the jury's deliberations."  Finally, the court

United States v. Parker, 872 F.3d 1, 7 n.5 (1st Cir. 2017), cert. denied, 138 S. Ct. 936

(2018), merely stated the Peña-Rodriguez holding and focused on whether the trial judge

erred in conducting group voir dire, instead of individual voir dire.

     The Court now turns to the other alleged statement that Juror A.J. attributed to

W.B.—that Smith was a black man with a criminal record.  While true, this statement

needlessly injected Smith's race into jury deliberations.   His criminal record provided a

proper basis by which to assess credibility, as the Court instructed the jury, but his race

was irrelevant to any such evaluation.  This statement alone, however, does not

sufficiently demonstrate overt racial bias, nor does it connect race or racial stereotypes to

the adjudication of guilt or innocence.  Accordingly, this alleged statement does not meet

the Peña-Rodriguez threshold showing, as it did not "tend to show that racial animus was

a significant motivating factor in the juror's vote to convict."  See 137 S. Ct. at 869.

     The Court next turns to the consideration of additional circumstances, including

the content and timing of the statement, as well as the witnesses' credibility.  See id.

     First, while the approximately five-hour deliberation period suggests that the jury

reviewed the evidence, that fact is undercut by D.B.'s testimony concerning the timing of

the remark.  He stated that the comment occurred after at least one prior vote had been

taken and approximately half an hour before the jury reached its verdict.  (Dec. 19, 2017 Redacted Hr'g Tr. at 31.)  This fact supports D.B.'s testimony that the statement influenced his vote to convict Smith.   And, as in Peña-Rodriguez, the content of the alleged comment directly related to the assessment of guilt.  Moreover, D.B. came forward of his own volition and did not provide the information based on the solicitation of counsel.  See Peña-Rodriguez, 137 S. Ct. at 870 ("Petitioner's counsel did not seek out the two jurors' allegations of racial bias.").

However, unlike the jurors in Peña-Rodriguez, who approached counsel immediately after the verdict was reached, id. at 861, 870, D.B. did not contact the Court with his concerns until four years after the trial.  The delay in timing implicates D.B.'s reliability and credibility as a witness.  As to the reliability of his memory, he acknowledged that when he sought to contact the Court in March 2017, he could not remember the name of the presiding judge, the names of other jurors, the length of deliberations, or even the precise offenses at issue.  (See Dec. 19, 2017 Redacted Hr'g Tr. at 47–49.)  However, D.B. testified that the alleged statement shocked him and stood out when other aspects of his jury service had faded.  (Id. at 40, 51.)   The Court finds this explanation credible.

The variations between D.B.'s recollection of the statement as set forth in his affidavit ("'You know he's just a banger from the hood, so he's got to be guilty'") versus his hearing testimony ("Besides, he's just a banger from the hood and he was guilty") are slight, and do not weigh against a finding of reliability. The fact that A.J. did not recall the "banger" statement, and that D.B. did not recall the statement recounted by A.J.

27

undermines the reliability of their testimony, to some extent.  One explanation that the
Government posits is that there was likely a single statement, yet neither juror agrees on
the content of the remark.  Even assuming that is so, A.J. conceded that his memory of
what transpired five years earlier during deliberations was not very clear, he could not
recall the statement "word for word," and his memory of the alleged statement was
"something along those lines" or "something to [the] effect" of the statement identified in
his affidavit.  (Id. at 21–22, 25–26.)  While D.B. also acknowledged his lapses in
memory, he testified that W.B.'s "banger" statement seemed inappropriate, upsetting, and
shocking.  (Id. at 40, 51.)   He testified that it "stuck out in my mind and I'm very certain
that's what he said." (Id. at 49.)  D.B. testified that the comment bothered him.  (Id. at
51.)  The Court finds it tenable that D.B. would remember the statement, given his strong
feelings about it and its effect on him, while A.J. might not recall the same words, which,
he testified, did not affect his vote.

    The Government contends that at the evidentiary hearing, D.B.'s account of the
statement "shifted significantly," by "first suggesting factors relating to Smith's
credibility meant Smith was guilty, then suggesting the reverse, that Smith's guilt was
relevant to his credibility."  (Gov't's Post-Hr'g Mem. at 36.)   But given the lack of
physical evidence in this case, credibility and criminal liability were directly connected.

    The Court also finds D.B.'s testimony concerning his discomfort with the
statement, and failure to confront it, (see Dec. 19, 2017 Redacted Hr'g Tr. at 51)—for
four years—believable.  As the Supreme Court has recognized,

    [t]he stigma that attends racial bias may make it difficult for a juror to

> report inappropriate statements during the course of juror deliberations.  It
> is one thing to accuse a fellow juror of having a personal experience that
> improperly influences her consideration of the case, . . . .   It is quite another
> to call her a bigot.

Peña-Rodriguez, 137 S. Ct. at 869.  The Court also finds that no evidence in the record

suggests that any jurors responded to the statement.  In contrast, in Commonwealth v.

McCowen, the court there found that although a juror made a racially stereotyped

statement about black men, the statement was appropriately blunted and exposed as racist

because a black female juror immediately challenged it.  939 N.E.2d at 761–766.  The

racist statement here, however, was unconfronted.

D.B. explained that feelings of shame prevented him from coming forward earlier.

(Dec. 19, 2017 Redacted Hr'g Tr. at 53.)  It is certainly plausible that despite the passage

of four years, a racially-charged statement would remain in one's mind.  In addition,

feelings of personal embarrassment and shame could reasonably make the statement's

significance all the more memorable.  Moreover, D.B. acknowledged that in reaching his

guilty verdict based on race, he violated his oath as a juror to render a decision based on

the evidence.  (Id. at 32.)  As such, his testimony that he voted to convict Smith based on

his race is a statement against his own interest.  The Court finds that people do not

generally make statements against their own interest, which lends support to D.B.'s

credibility.  For all of the foregoing reasons, the Court finds the testimony of D.B., on

balance, reasonably reliable and credible.

In sum, the Court thus finds that in light of all the circumstances here, the no-

impeachment rule must give way to the Sixth Amendment's guarantee of the right to trial

by a fair and impartial jury.  Accordingly, the Court will consider Smith's motion for a

new trial based on juror testimony of racial bias.

> **D.    Motion for New Trial**

Under Rule 33, a district court may grant a new trial "if the interest of justice so

requires." Fed. R. Crim. P. 33(a).  However, as noted, motions for a new trial are

disfavored, United States v. Anwar, 880 F.3d 958, 968 (8th Cir. 2018) (citing United

States v. Rubashkin, 655 F.3d 849, 857 (8th Cir. 2011)), reh'g & reh'g en banc denied,

8th Cir. Mar. 2, 2018), and the remedy is reserved for exceptional cases in which "the

evidence weighs so heavily against the verdict that a miscarriage of justice may have

occurred." Anwar, 880 F.3d at 968 (citing United States v. McClellon, 578 F.3d 846, 857

(8th Cir. 2009)).  Addressing the admission of prejudicial witness testimony elicited by

the government, the Eighth Circuit stated in Anwar that typically, courts strike the

testimony and instruct the jury to disregard the remark.  Id.  at 986–99 (citation omitted).

And in determining a motion for a new trial on such a basis, courts may "quantitatively

assess[,] in the context of other evidence presented[,] . . . whether its admission was

harmless beyond a reasonable doubt." Arizona v. Fulminante, 499 U.S. 279, 307–08

(1991).

Here, however, as discussed above, no such remedy was possible, as the remark

was made by a juror during deliberations.  The Court thus agrees with defense counsel

that the constitutional violation here is akin to a structural defect, that is,  "[a] structural

defect[ ] in the constitution of the trial mechanism." (See Def.'s Mot. at 15) (citing

Fulminante, 499 U.S. at 309–10).  Courts have found structural error in cases involving

the deprivation of the right to counsel at trial, the deprivation of an impartial judge, the

exclusion of members of the defendant's race from a grand jury, the right to self-

representation at trial, and the right to a public trial.  Fulminante, 499 U.S. at 310 (citing

Gideon v. Wainwright, 372 U.S. 335 (1963); Tumey v. Ohio, 273 U.S. 510 (1927);

Vasquez v. Hillery, 474 U.S. 254 (1968); McKaskle v. Wiggins, 465 U.S. 168, 177–78,

n.8 (1984); Waller v. Georgia, 467 U.S. 39, 49, n.9 (1984)).  Like these examples of

structural defects, the Court finds that the deprivation of the right to a trial by an

impartial, non-racist jury is a "structural defect affecting the framework within which the

trial proceeds, rather than simply an error in the trial process itself."  Id.

But even subjecting the facts to harmless error analysis, the Court finds that

W.B.'s remark prejudiced Smith and was not harmless beyond a reasonable doubt.  The

Eighth Circuit does not appear to have conducted this analysis in the context of a juror's

racist remark.  However, in cases of juror outside contacts, the court has found that "the

ultimate question" is whether the outside intrusion affected the jury's deliberations, and

therefore, its verdict.  Tucker, 137 F.3d at 1030 (stating that the defendant must show

prejudice stemming from outside contact and influence with a juror); United States v.

Hall, 85 F.3d 367, 371 (8th Cir. 1996) (noting that to determine whether extraneous juror

contact was harmless to the defendants, courts assess the effect that the information

would have had on a typical juror).  In the extraneous-influence context, the Eighth

Circuit has held that a rebuttable presumption of prejudice applies only to extrinsic

contact relating to factual evidence not developed at trial.  Hall, 85 F.3d at 371 (citing

United States v. Cheyenne, 855 F.2d 566, 568 (8th Cir. 1988)).  The comment here,

invoking gang membership, was not based on any evidence at trial.

In objectively assessing the prejudicial impact of an outside influence on a typical juror, the following considerations are relevant:

> 1) whether the extrinsic evidence was received by the jury and the manner in which it was received; (2) whether it was available to the jury for a lengthy period of time; (3) whether it was discussed and considered extensively by the jury; (4) whether it was introduced before a jury verdict was reached and, if so, at what point during the deliberations; and (5) whether it was reasonably likely to affect the verdict, considering the strength of the government's case and whether the government's case outweighed any possible prejudice caused by the extrinsic evidence.

Id. (citing United States v. Blumeyer, 62 F.3d 1013, 1017 (8th Cir. 1995)).

The evidence here shows that the remark was unrelated to any evidence admitted at trial. It was received by the jury, with no evidence showing that any juror challenged it. While it was not "available" to the jury for a long period of time, the remark was made in the final half hour of a five-hour deliberation period, and was made before a verdict was reached. The proximity of the statement to the verdict suggests that the remark influenced the final vote. In addition, the jurors' affidavits and the evidentiary hearing testimony credibly show that the "banger" remark influenced D.B.'s vote to convict Smith. The comment had outsized significance and materiality in this case, as there was no physical evidence linking Smith to the gun. Similarly, in State v. Johnson, 630 N.W.2d at 82, the question of the defendant's guilt depended on juror assessments of witnesses' credibility. The court there found that the remark "I've got a rope" created a presumption of prejudice. Id. at 84 (citation omitted). The court observed that although the evidence might have sufficiently supported a guilty verdict absent the racially

32

prejudicial remarks, "it [was] significant that the issues at trial were exclusively dependent on juror assessments of credibility"—including the credibility of the victim. Id.

Here too, the case turned on the jury's assessment of the credibility of the witnesses. And, sadly, even the safeguards for a fair trial—voir dire examination for impartiality and possible biases, the jurors' oath to be fair and impartial, and the Court's instructions regarding the same—were insufficient. Under Eighth Circuit law in the context of jurors' outside contacts, even the exposure of one juror to a prejudicial extraneous matter is enough to support a finding of prejudice. Tucker, 137 F.3d at 1031–32. Even if W.B. were to disavow any racial bias, D.B.'s testimony shows that the statement affected his vote. He testified that the racially biased comment changed his assessment of credibility and guilt, and he convicted Smith because of his race. (Dec. 19, 2017 Redacted Hr'g Tr. at 31–32, 49–51.

Under all of these circumstances, and based on a careful review of the record, the Court finds that Smith has established that a racially-biased remark denied him the right to trial by an impartial jury under the Sixth Amendment. This is an exceptional case in which a miscarriage of justice may have occurred. Accordingly, in the interest of justice, his motion for a new trial is granted.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Defendant's Motion for a New Trial [Doc. No. 120] is **GRANTED**; and

2.  The Court will conduct a status conference in this case in the St. Paul

    Federal Courthouse, Courtroom 7B, on May 22, 2018 at 9:30 a.m.

33

Dated: April 24, 2018

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge
